K997PERT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RAFAEL PEREZ,

                    Plaintiff,

          v.                          19 Civ. 8683 (SLC)

ROSSY'S BAKERY & COFFEE SHOP, INC.,
d/b/a ROSSY'S BAKERY,
and ROSELIA CABA, individually,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      September 9, 2020
                                      9:30 a.m.

Before:

                    HON. SARA L. CAVE

                                      Magistrate Judge

                         APPEARANCES

JACOB ARONAUER
     Attorney for Plaintiff

HOWARD CHUN
     Attorney for Defendants

ALSO PRESENT:  Carlos Cruz, Spanish Intrepreter
               Ana Salas, Spanish Interpreter

K997PERT

| | |
|---|---|
| 1 | (Case called) |
| 2 | (In open court) |
| 3 | MR. ARONAUER:  Good morning, your Honor.  Jacob |
| 4 | Aronauer for the plaintiff.  To my right is the translator |
| 5 | Carlos Cruz.  To his right is my client plaintiff Rafael Perez. |
| 6 | THE COURT:  Good morning. |
| 7 | Good morning, Mr. Cruz.  Good morning, Mr. Perez. |
| 8 | MR. CHUN:  Good morning, your Honor.  For the |
| 9 | defendants, Kaplan & Chun, Howard Chun.  To my left is the |
| 10 | principal and another defendant Roselia Caba. |
| 11 | THE COURT:  Good morning, Mr. Chun. |
| 12 | Good morning, Ms. Caba. |
| 13 | THE COURT:  So I understand before we get started we |
| 14 | need to sort out an issue with respect to the translator? |
| 15 | MR. ARONAUER:  Yes, your Honor.  I apologize.  I made |
| 16 | an error.  In terms of today's trial, my intent was to have Mr. |
| 17 | Cruz be the translator for all the testimony that takes place. |
| 18 | In the event that my client wants to ask me a question, or if I |
| 19 | need to ask my client a question, I would like to have a |
| 20 | part-time member of our staff sit in the middle of us, so that |
| 21 | way I could interact with my client.  I apologize, that was an |
| 22 | oversight on my part. |
| 23 | THE COURT:  I am just concerned about the spacing.  We |
| 24 | have you closer than what we would prefer.  I am just trying to |
| 25 | figure out how we arrange this so that you're not sitting on |

K997PERT

1   top of each other.

2             INTERPRETER:  Your Honor, if it's OK, I usually sit in

3   the back until it's time for the witnesses to testify, so I

4   don't mind sitting in the back.

5             THE COURT:  Thank you, Mr. Cruz.  That might solve the

6   problem then.  So Mr. Cruz will take a seat in the gallery, and

7   the other interpreter can take a seat.

8             THE COURT:  Good morning.  Please be seated.  So that

9   will work for you, Mr. Aronauer?

10            MR. ARONAUER:  Yes, your Honor.

11            THE COURT:  And when Mr. Perez is testifying, Mr. Cruz

12   will come up and sit next to Mr. Perez and translate for him.

13            MR. ARONAUER:  Perfect.  Thank you, your Honor.

14            THE COURT:  Very good.  Are the parties prepared to

15   proceed with opening arguments?

16            MR. ARONAUER:  Yes.  Just briefly, your Honor.  The

17   testimony and documentary evidence today will demonstrate that

18   the defendants ran frankly a fast and loose corporation with

19   respect to the matter in which they kept track of their

20   employees' records.

21            The fact of the matter is that the defendant is

22   attempting to use the lack of good business keeping -- which is

23   not in compliance with both the FLSA and New York Labor Law --

24   as a mechanism -- or a vehicle, rather, to argue that my client

25   only worked at the defendant's corporation for only one week.

K997PERT

| | |
|---|---|
| 1 | I'm confident that at the end of this trial the Court |
| 2 | will see that is exactly what the defendant is trying to do and |
| 3 | find that my client did work at Rossy's Bakery during the |
| 4 | relevant time period that we allege. |
| 5 | THE COURT:  And the full time period that you are |
| 6 | alleging here is what? |
| 7 | MR. ARONAUER:  January 2017 to August 2017. |
| 8 | THE COURT:  OK.  And you have both Fair Labor |
| 9 | Standards Act claims as well as New York Labor Law claims. |
| 10 | MR. ARONAUER:  Correct. |
| 11 | THE COURT:  Mr. Chun? |
| 12 | MR. CHUN:  Good morning.  As we all know, payments in |
| 13 | cash can be a double-edged sword, because there are no records. |
| 14 | The plaintiff is claiming that he was not paid sufficiently for |
| 15 | a period of eight months.  We submitted -- both sides submitted |
| 16 | documentary evidence and trial exhibits.  You don't see any |
| 17 | receipts, bank statements, text messages, witnesses, videos, |
| 18 | recordings, or even his own tax returns, that he could have |
| 19 | used to corroborate by saying, you know what, I was paid $500 a |
| 20 | week in cash, or X dollars per week in cash, I worked for these |
| 21 | months, this was the total I made, I reported it to the United |
| 22 | States government. |
| 23 | All the defendant is trying to do now is say, look -- |
| 24 | all the plaintiff is trying to do now is say, look, defendants, |
| 25 | look at what they did, they got caught by the Department of |

K997PERT

1    Labor for New York State.  We're pretty sure it was the

2    plaintiff who filed the labor law claim.

3            My client then turned over all of the records, payroll

4    records, everybody that she has on her payroll.  He is not on

5    any payroll documents.

6            The plaintiff only worked for one week as a trial-run

7    basis, whether he was going to be a good fit for this

8    restaurant.  It didn't end up being that way.  He was paid for

9    the hours that he worked.

10           You're going to hear testimony that the plaintiff

11   worked until 9 o'clock or even past 9 o'clock.  Once the store

12   actually shuts down, is closed to customers, then it's time to

13   clean up.  That's done by the defendant and her family members;

14   that's not done by any employees.  It never would have been

15   done by the plaintiff.

16           So, you heard plaintiff's counsel talking about the

17   documents and the evidence, but there isn't any.  In fact, our

18   documents and our evidence shows that he didn't do anything

19   that he said; he wasn't there for any longer than one week, he

20   never provided his own Social Security number to even get a

21   1099 or a W-2, whatever the case might be.  Thank you.

22           THE COURT:  Thank you.

23           Mr. Aronauer, are you prepared to proceed with your

24   first witness?

25           MR. ARONAUER:  Yes, your Honor.  Plaintiff calls

K997PERT                        Caba - direct

1     Roselia Caba as a hostile witness.

2                 THE COURT:  Ms. Caba.

3                 MR. ARONAUER:  Your Honor, with the court's blessing,

4     I will provide Ms. Caba with a copy of the plaintiff's

5     exhibits.

6                 THE COURT:  The same version that I have, right?

7                 MR. ARONAUER:  Correct.

8                 THE COURT:  Very good.  Please go ahead.

9                 Ms. Caba, you can approach and take a seat right

10    there.

11     ROSELIA CABA,

12          called as a witness by the plaintiff,

13          having been duly sworn, testified as follows:

14                THE COURT:  While you are testifying, you can take

15    your mask off because you are protected by the plexiglass.

16                DEPUTY COURT CLERK:  Please state your full name and

17    spell your last name for the record.

18                THE WITNESS:  Roselia Caba, C-a-b-a.

19                DEPUTY COURT CLERK:  Thank you.

20    DIRECT EXAMINATION

21    BY MR. ARONAUER:

22    Q.  Good morning, Ms. Caba.

23    A.  Good morning.

24    Q.  I just want to confirm that you have been the sole owner of

25    Rossy's Bakery for the last ten years?

K997PERT                    Caba – direct

1   A.  Yes.

2   Q.  And I am assuming that the store was named after you; is

3   that correct?

4   A.  Yes.

5   Q.  And Rossy describes itself as both a coffee shop and a

6   bakery, correct?

7   A.  Correct.

8   Q.  And could you please for the record tell the Court the

9   address.

10  A.  242 East Third Street, New York, New York 10009.

11  Q.  And is it accurate that you have an e-mail that you use on

12  behalf of Rossy's Bakery?

13  A.  Yes.

14  Q.  Could you please tell the Court what that is.

15  A.  Rossy'sbakery@verizon.net.

16  Q.  OK.  And is it accurate that Rossy's Bakery is open seven

17  days a week?

18  A.  Yes.

19  Q.  And is it accurate that it's open 8 a.m. to 8 p.m. every

20  day?

21  A.  Yes.

22  Q.  And is it accurate that's also a place for customers to sit

23  and order food?

24  A.  Correct.

25  Q.  And do you have waiters and waitresses to help?

K997PERT                    Caba – direct

1    A.  Not waiters.  We just serve the food, hand it over the

2    counter, and they sit down.

3    Q.  And how many square feet is Rossy's Bakery?

4    A.  About 1,000.

5    Q.  And as the owner, are you there seven days a week?

6    A.  Yes.

7    Q.  Are you ever there alone?

8    A.  Sometimes.

9    Q.  How often?

10   A.  Usually in the morning, almost every day, for a little

11   while, maybe late at night.

12   Q.  OK.  So is it your testimony that for a portion of the

13   morning or a portion of the night you are alone?

14   A.  Yeah, I could be alone sometimes.

15   Q.  OK.  But my question -- I'm sorry if I wasn't clear -- in

16   the course of the day is there usually staff there?

17   A.  Yes.

18   Q.  OK.  And in addition to -- it's my understanding that

19   Rossy's Bakery serves traditional Dominican food?

20   A.  Yes.

21   Q.  Along with Dominican cakes?

22   A.  Yes.

23   Q.  You decided -- strike that.

24          Previously, prior to opening your own store you worked

25   in the private sector?

K997PERT                    Caba – direct

1    A.  Private sector?  We started, and my mom started from her

2    apartment.

3    Q.  No, no, I'm sorry.  You held a different job prior to being

4    the owner.

5    A.  Oh, yes.  Yes.

6    Q.  OK.  What was that?

7    A.  I used to work for a nightclub.  I used to be in the

8    accounting department.

9    Q.  And then you decided you wanted to open your own

10   restaurant, correct?

11   A.  Correct.

12   Q.  And one of the reasons why you decided to open your own

13   restaurant, it's my understanding, is that you wanted your

14   mother to be able to bake cakes?

15   A.  Correct.

16   Q.  OK.  Would it be fair to say that your mother is an

17   employee of the restaurant?

18   A.  Yes.

19   Q.  OK.  And would it be fair to say that you do not pay her a

20   salary?

21   A.  No, not at the moment.

22   Q.  When you say "not at the moment," could you expand --

23   A.  My mom is retired.

24   Q.  Your mom is no longer working there?

25   A.  She comes to the bakery, she overseas, but she is retired

K997PERT                    Caba - direct

1    already.

2    Q.  I'm sorry, I am not clear.  How many days a week is your

3    mother there?

4    A.  She comes like in the morning sometimes, and she comes for

5    a few hours and then she leaves.

6    Q.  How many days a week is your mother there?

7    A.  She could be there five days.

8    Q.  OK.  And how many hours in the course of those five days is

9    she there?

10   A.  Could be about three or four hours.

11   Q.  OK.  And is she paid hourly, weekly, or something

12   different?

13   A.  My mom doesn't get paid.  That's my mom.  She is helping me

14   out.  She was getting paid at one point, and she decided to

15   retire.

16   Q.  OK.  So it's your position that because it's your mother,

17   you don't have to pay her?

18   A.  Well, if she wants to come in, I can't tell her, no, don't

19   come in, if she wants to show up.

20   Q.  And you accept the benefit of her labor, correct?

21   A.  Well, if she comes in, it's my mom.  You can't come in?  So

22   if she wants to come in, what am I gonna do?

23   Q.  What does she do for your bakery?

24   A.  Well, she looks to make sure that we are mixing the cake

25   batter and stuff correctly.

K997PERT                          Caba – direct

1   Q.  Would it be fair to say that your company benefits from her

2   labor?

3   A.  Well, we have learned everything from her, yes.

4   Q.  OK.  And it would be fair to say that she is not the only

5   person who works for you for free?

6   A.  My stepfather helps out as well.

7   Q.  How many days a week is your stepfather in?

8   A.  He comes in probably about six days.

9   Q.  OK.  And he is also not being paid anything, right?

10  A.  No, he is retired as well.

11  Q.  He is retired.

12  A.  And he comes in the evenings.

13  Q.  So he is retired except for the fact that he comes in and

14  does work for you.

15  A.  Yeah, he comes in.  What am I supposed to do?  Don't let

16  your parents hang around the house?

17  Q.  Are there any records pertaining to the fact that your

18  mother performs labor on behalf of the company?

19  A.  Before?  Yes.

20  Q.  I'm sorry, I'm not clear then.  At a certain point in time

21  was your mother being paid for her labor?

22  A.  Correct, yes.

23  Q.  OK.  From when to when?

24  A.  From like the beginning when we opened until probably three

25  years back.

K997PERT                          Caba - direct

1   Q.  Can we get the years so that we're clear?

2   A.  Maybe 2018.  Into 2018.

3   Q.  It's your testimony that from 2018 --

4   A.  I am not sure.

5   Q.  Excuse me, ma'am, ma'am, please let me finish the question.

6   It's your testimony that from 2018 to 2020 you have not paid

7   your mom any money for the work that she has done on behalf of

8   your company?

9   A.  I'm not sure about the correct dates.  I would have to

10  check the payroll.

11  Q.  But more than a year.

12  A.  Yes.

13  Q.  OK.  And with respect to your stepfather, how long has he

14  been, in your words, retired but still performing work on

15  behalf of your company?

16  A.  Probably around the -- well, my stepfather had a job, so he

17  just started coming in a few years ago.

18  Q.  Ma'am, do you mean two years, three years?

19  A.  I want to say probably about three years.

20  Q.  So three years working for you, and he has not been paid

21  for his labor either.

22  A.  Correct.

23  Q.  OK.  And it would be fair to say that he is also not the

24  only family member who works for you and that isn't paid?

25  A.  No, that's it.

K997PERT                        Caba - direct

1    Q.   Do you have a son?

2    A.   Yeah.

3    Q.   Does your son ever work in the restaurant?

4    A.   He comes by.  If he sees that I'm busy, he helps me out.

5    Q.   And do you pay him for his labor?

6    A.   He lives with me -- well, he lived with me at the point --

7    at some point -- and he will come in, he will grab food, but he

8    sees if I'm busy, he will grab something, help a customer out

9    or something like that.  But he was never there full-time or,

10   you know, every day.

11   Q.   OK.  Well, how many days a week would you say your son

12   worked for you?

13   A.   That he might stop by?  Could have been three or four times

14   a week.

15   Q.   And he never gets paid for any of those days.

16   A.   No, because he probably could be there one day for 15

17   minutes, one day he could be there for an hour.  If he is

18   eating, he might be sitting down eating, he might take care of

19   a customer.  If you think that's working, then that's working

20   to you, but to me it's not.

21   Q.   And finally your brother also works for you, correct?

22   A.   Correct.

23   Q.   And would it be fair to say that your brother is a little

24   bit more of a consistent schedule?

25   A.   Correct.

K997PERT                     Caba – direct

1   Q.  And how long has he worked for you for?

2   A.  From like the beginning.

3   Q.  Beginning meaning?

4   A.  In 2010.

5   Q.  OK.  And would it be fair to say that you pay him a weekly

6   salary?

7   A.  Correct.

8   Q.  You do not pay him hourly.

9   A.  No.

10  Q.  And what are his job duties?

11  A.  He just does the cashier and maybe stock sometimes.

12  Q.  OK.  So, as noted by your attorney, you were previously

13  investigated by the New York Department of Labor, correct?

14  A.  Yes.

15  Q.  Could you please turn to Plaintiff's Exhibit B.  Take a

16  moment, please, to review the document.  It's approximately --

17  I will give you the exact amount.  It's four pages long.

18          I assume the Court is OK with her reviewing it.

19          THE COURT:  That's fine.  That's fine.

20          Do you have it in front of you?

21          THE WITNESS:  Yes.

22  Q.  Are you done reading it, ma'am?

23  A.  I've seen it.

24  Q.  So it's accurate that you previously received and had the

25  opportunity to review this document before today?

K997PERT                          Caba - direct

1    A.   Yes.

2    Q.   Now, is it accurate that the Department of Labor did an

3    investigation on your company from 2015 through 2018?

4    A.   Correct.

5    Q.   And did that cover the time period that my client worked

6    for your company?

7    A.   Yeah, I guess sometime in there.

8    Q.   I'm having trouble hearing you.

9    A.   Sometime in there, in between that time, yes.

10   Q.   OK.  And it's accurate that during this time period --

11   strike that.

12          I want to turn your attention to the second full

13   paragraph, second to last sentence:  "Said records did not list

14   hours worked by employees."

15          It's on the first page, ma'am.

16   A.   OK.

17   Q.   First page, second full paragraph, second to last sentence.

18   A.   OK.

19   Q.   OK.  Did you object to this finding by the Department of

20   Labor?  When I say object, I mean did you file a formal appeal

21   or anything like that?

22   A.   No, I didn't.

23   Q.   Sorry?

24   A.   No, I didn't.

25   Q.   And it's accurate that the Department of Labor also found

K997PERT                         Caba - direct

1    that you failed to pay one of your employees in compliance with

2    the law, correct?

3    A.   Correct.

4    Q.   That would be Genesis Collado?

5    A.   Yes.

6    Q.   Then if your turn your attention to the second page.  If

7    you go to the heading that starts with -- not starts with --

8    the heading that says "violations" -- it lists various

9    violations on your behalf -- on your part, rather.  Do you see

10   that?

11   A.   Yes.

12   Q.   Do you object to any of those findings?  And, if so, why?

13            THE COURT:  Did you or do you?

14   Q.   Do you object to any of those findings and, if so, why?

15   A.   Well, I do in the sense that Genesis Collado, this was just

16   a few months minimum wage, and I had the payroll set up, but

17   she did work the hours that she was paid for.  At the time

18   Ms. Collado was on some program; she had been incarcerated.

19   So, I didn't have the chance to change the payroll.  But

20   whenever she goes back, she has to show the amount that she

21   earned plus the amount of time that she has been out to go to

22   work.  So, that was done.  There was a letter sent to them, and

23   she worked the hours that she was paid for.  So, it was just a

24   discrepancy on my part not changing the wages.  But her hours

25   were adjusted.

K997PERT                         Caba - direct

1    Q.  I apologize if I was not clear.  If you go to the

2    violations heading -- actually, I don't think it has anything

3    to do with Ms. Collado.  It's just general observations made

4    with respect to how you complied -- or not complied with the

5    New York Labor Law.  Do you see Section 661, part 146-2.2?

6    It's not limited to one employee.  That's the way I read it.

7    Do you read it differently?

8    A.  Well, this was not discussed with me when he was there and

9    he interviewed the employees.  And I told him --

10   Q.  Ma'am, I'm sorry.

11          THE COURT:  Please don't interrupt the witness while

12   she is testifying.

13   A.  So, this was not -- how can I say, he didn't ask me for

14   certain records.  He interviewed the employee.  He went and

15   then pretty much sent me the information.  He left me a note of

16   what he needed, and I sent it out to him.

17          So, when he reports to the wages and stuff like that,

18   I had everything with the payroll.  I don't know what else he

19   wanted.  He didn't ask me for it.

20          THE COURT:  Continue.

21   Q.  So, let's turn if we can, for example, part 146-2.5, for

22   failure to pay by hourly rates of pay.  You have admitted

23   earlier in your testimony though that you paid your brother by

24   the week, not by the hour, correct?

25   A.  Correct.

K997PERT                         Caba - direct

1   Q.  OK.  And with respect to Mr. Perez, the plaintiff in this

2   matter, you did not provide him a form setting forth what his

3   hourly rate of pay would be upon hire, did you?

4   A.  No, because he was on a trial basis, and, like I said, when

5   we finished that week, I told him bring me the paperwork on

6   Monday, and that was it.  We didn't go over anything else.  You

7   know, I had him work.  He knew what he was getting for that

8   week, and that was it.

9   Q.  Would it be fair to say, ma'am, that you do not pay your

10  own family members in compliance with the FLSA and New York

11  Labor Law?

12  A.  What are you getting at?  If my mom and stepfather want to

13  come and help me, I cannot kick them out of the store.  You

14  know, so if you want to say they work for me, then fine, they

15  work for me, if that's what you want to say.

16  Q.  Did you pay the fine issued by the New York Department of

17  Labor?

18  A.  Yes, I did.  Yes.  And I could have appealed it because I

19  could have went back to the Department of Corrections and let

20  them do the whole research of the time that she was out or not,

21  but I just didn't have the time to go through that.

22          MR. ARONAUER:  Your Honor, I respect the Court's

23  ruling that it doesn't want me to interrupt the witness.  On

24  the other hand, I am asking questions and she is going beyond

25  the scope.

1            THE COURT:  You called her as a witness.

2            MR. ARONAUER:  Also as a hostile -- excuse me -- as an

3    adverse witness.

4            I will proceed.  Never mind.

5    Q.  Can you please turn to plaintiff's Exhibit C.  Are you

6    there, ma'am?

7    A.  Yes.

8    Q.  Is it accurate that you did not provide this form or

9    similar form to Mr. Perez upon hire?

10   A.  No.

11   Q.  No, it's not accurate?  Or, no, you did?

12   A.  No, I didn't.

13   Q.  Did not what?

14   A.  Give it to him.

15   Q.  Give what to him?

16   A.  This form.

17   Q.  Could you please turn to Exhibit D.

18           I understand there is obviously a disagreement between

19   the parties the length of time that Mr. Perez worked for you,

20   but at least with respect to the one week that he worked for

21   you that I think we are all in agreement about, did you give

22   him a form like this when you paid him?  Or anything like it?

23   A.  No.

24   Q.  And that's because you paid him in cash, correct?

25   A.  Correct.

K997PERT                        Caba - direct

1  Q.  But nothing else.

2  A.  That's it.

3  Q.  And the amount of cash you gave him was $475.

4  A.  I think it might have been 450.  I'm not sure, I can't

5  recall.

6  Q.  OK.  And do you know how you came up with that number?

7  A.  Well, he worked for five days, and I think it was 11 to 7,

8  so I just did 450 on him.

9  Q.  Well, did you see what the New York Labor Law was?  Was it

10  minimum wage?

11  A.  I don't remember what was the minimum wage then.

12  Q.  Well, how did you come up with that number?

13  A.  Well, probably, you know, if you look at the rate then.

14  We're talking about, what, two, three years back.

15  Q.  Well, do you remember what the rate was?

16  A.  I don't know, probably about $10.50, $10.  I don't know.

17  Q.  Did you have a discussion with Mr. Perez about how he would

18  be paid by you --

19  A.  Yes.

20  Q.  -- in the interview?

21  A.  Well, Mr. Perez called me several times to come in, that he

22  wanted to work, did I have anything.  And when I finally told

23  him to come in the one time, he didn't show up.  And then he

24  will bug me again and then he came in finally.

25       Another time I was like, OK, fine, come in.  I said

K997PERT                    Caba - direct

1    I'll try you out, that's it.  And we did that.  So that

2    Saturday when I gave him the cash, I told him he needed to

3    bring me the paperwork on Monday, like his Social, his ID,

4    residence card, whatever it was.  He said fine, and that was

5    the end of it.

6    Q.  Can you please with respect to before he began work, did

7    you say to him that he would be paid $475 a week?

8    A.  I told him -- I think it was like around 450 or so.

9    Q.  So you said he would be paid a weekly rate.

10   A.  Correct.

11   Q.  OK.  And during the time period that Mr. Perez worked for

12   you, he was not required to clock in or clock out; is that

13   accurate?

14   A.  Correct.

15   Q.  And that's because your company does not have, for lack of

16   a better word, a punch-in and punch-out machine?

17   A.  No.

18   Q.  Or any other type of way that you keep track of the hours?

19   A.  No.

20   Q.  So, Rossy's which serves breakfast, lunch and dinner --

21   strike that.

22        So Rossy's is open 8 to 8, so is it fair to say they

23   serve both breakfast, lunch and dinner?

24   A.  I guess, yes.

25   Q.  And before trial I confessed to going to your Instagram

K997PERT                         Caba - direct

1    page.

2    A.   OK.

3    Q.   And noticing all the beautiful cakes that you have.   How

4    much does a cake run?

5    A.   A cake will run from $35 to $150 usually.   You know,

6    sometimes we have those cakes above maybe 800, but not that

7    often.

8    Q.   That would be like getting a big fish?

9    A.   I'm sorry?

10   Q.   Strike that.   With respect to $300 cakes, do you have to

11   get a special order, or do you make it in advance?

12   A.   It's a special order.   Everything -- we only work by

13   orders.   So, you have to call in, say what you want, and then

14   we go from there.

15   Q.   You don't have any cakes at all --

16   A.   No.   Whole cakes.

17   Q.   What about slices?

18   A.   Yes.

19   Q.   So do you have just the individual slices, or do you have

20   the cake and somebody asks for a slice?

21   A.   Only individual slices in the front.   Like I said,

22   everything is done by orders.

23   Q.   And on average -- strike that.   And Rossy's accept credit

24   cards, correct?

25   A.   Yes.

K997PERT                         Caba - direct

1   Q.  And during the relevant time period, 2017, were you on any

2   of the online food ordering companies such as Seamless or Grub

3   Hub?

4   A.  I don't think so.

5   Q.  But you're on them now?

6   A.  Yes.

7   Q.  On average, how many credit card sales did you have a day

8   in 2017?

9   A.  No idea.

10  Q.  On average how many cash sales would you have in 2017?

11  A.  I wouldn't be able to tell you that, you know.

12  Q.  Well, how do you keep track of your cash sales?

13  A.  Oh, you're talking about like you want to know how much?

14  Or how many transactions do I have a day?

15  Q.  Well, I'm getting there.  But I mean the question is:  I go

16  in and I buy a cup of coffee --

17  A.  You bring that in.

18  Q.  I give a dollar.

19  A.  $1.25.

20  Q.  OK.  You're not charging me extra because I'm the

21  adversary.  And the question is:  For accounting purposes, for

22  tax purposes, how do you know, OK, we received $1.25 for this

23  coffee?

24  A.  We have a POS system.

25  Q.  I'm all ears.  What does that mean?

K997PERT                    Caba - direct

1    A.  It's a computer system that we use to ring everything that

2    comes in.  And, you know, you have the computer set up.  It's a

3    point of sales.

4    Q.  Every purchase is recorded electronically.

5    A.  Correct.

6    Q.  On average, how much would you generate in business a day?

7    A.  You're talking about --

8    Q.  Gross.

9    A.  Amount?

10   Q.  Yes.

11   A.  On average it could be about 1800.

12   Q.  OK.  And are there times, like, for example -- I'm going

13   back to your cakes -- like during the graduation periods, would

14   you have more people purchasing cakes more often or more

15   frequently?

16   A.  Yeah, I guess.  It all depends on the holidays or, you

17   know, whatever, maybe baptism or stuff comes around.

18   Q.  But on average about $1800 a day in sales.

19   A.  Correct.

20   Q.  Do you recall what your rent was in 2017?

21   A.  Maybe about 5,000 something.

22   Q.  Currently it's 6,000, correct?

23   A.  Right.

24   Q.  It's your testimony that in the last three years it's gone

25   up about $1,000 approximately?

K997PERT                    Caba - direct

1    A.  Probably, because it goes up I think every October.

2    Q.  In 2017 what were your monthly expenses with respect to

3    staff?

4    A.  No idea.

5    Q.  2017 what were your monthly expenses with respect to

6    purchasing food supplies?

7    A.  I don't know.

8    Q.  On average, how many employees do you have on a day?  And

9    that includes anybody who is a family member.

10   A.  Probably about three, four.

11   Q.  And name those three or four people.

12   A.  You want me to name them?

13   Q.  Or just give their positions.

14   A.  Baker, baker, cashier.

15   Q.  Baker?

16   A.  Baker, baker, cashier.

17   Q.  That's three.  Are there any preps?

18   A.  Well, my mom preps.

19   Q.  OK.  Again, so I'm asking -- I said include all family

20   members?

21   A.  Oh, including.

22   Q.  Yes.

23   A.  OK.  So, about four, five -- let me see.  Six?

24   Q.  So basically it's fair to say you have six overall

25   employees:  Three who are on the official payroll, and three

K997PERT                    Caba - direct

1    who are on the family plan.

2    A.   Correct.

3    Q.   And with respect to the three who are on the payroll -- and

4    has that deviated at all in the past three years or so?  I am

5    assuming 2017 that was a similar situation.

6    A.   Yeah, probably.

7    Q.   How much did a baker -- and they are all full time?

8    A.   No, they are part time.

9    Q.   OK.  So how much does baker 1 make a year?

10   A.   How many what?

11   Q.   How much does baker 1 make a year?

12   A.   I don't know, probably about 10,000 or so.

13   Q.   And how many hours a week does baker 1 work?

14   A.   I want to say probably about ten hours.

15   Q.   And with respect to baker 2?

16   A.   Probably the same.

17   Q.   Same pay, same amount of hours?

18   A.   No, they have different pay.  But probably, you know,

19   maybe -- probably they would be the same hours almost.

20   Q.   Well, what time do the bakers come in?

21   A.   I could have them probably around 11 to 2 p.m. or so.  It

22   all depends the days that we don't have them.  You know, so we

23   try to make up the hours and stuff for them to come in.  Maybe

24   usually on the weekends they spend more time, you know.

25   Q.   And with respect to the cashier?

K997PERT                    Caba - direct

1   A.  My brother comes in, and he comes in a couple hours, goes

2   back out, comes in.  I'm usually there, so.

3   Q.  Who is usually ringing up the sales?

4   A.  I am.

5   Q.  And who is doing the cooking while you're ringing up the

6   sales?

7   A.  Well, pretty much my mom preps everything, and we just go

8   back and forth and stuff like that.  We are not a la carte;

9   it's just something a steam table.  The food gets prepped and

10  like hot food where you serve.

11  Q.  And who makes the hot food?  Your mother?

12  A.  My mom or me.

13  Q.  So if you're doing the cooking, who is then the cashier?

14  A.  Like I said, something gets prepped and it's just brought

15  out, and then we don't have to worry about that.

16  Q.  So when does the prep take place?

17  A.  Sometimes at night.  So, I do some of the prepping.  If

18  there is something I am missing, maybe my mom will prep it.

19  But pretty much with the prep, I throw everything in.  I come

20  in sometimes at 6 o'clock in the morning.

21  Q.  And with respect to -- strike that.

22          I apologize if I already asked this question.  2017

23  you did accept credit cards, correct?

24  A.  Yes.

25          MR. ARONAUER:  Your Honor, subject to the parties'

K997PERT                      Caba - direct

1   stipulation, I would like to admit Exhibit B, Exhibit C and D

2   into evidence.

3           THE COURT:  Any objection from defendant?

4           MR. CHUN:  No.

5           THE COURT:  To Plaintiff's Exhibit B, C and D are

6   admitted into evidence.

7           (Defendant's Exhibits B, C and D received in evidence)

8           MR. ARONAUER:  I also would like to admit Exhibit E,

9   the deposition of Ms. Caba.

10          THE COURT:  Defense, any objection?

11          MR. CHUN:  No objection.

12          THE COURT:  So Exhibit E, Ms. Caba's deposition

13  transcript, will be admitted as well.

14          (Plaintiff's Exhibit E received in evidence)

15  Q.  With respect to Mr. Perez, what was his job duties at the

16  bakery?

17  A.  Dishwasher.

18  Q.  And I'm not trying to be a wise guy.  Dishwasher, what did

19  he do?  Just washing dishes the whole day?

20  A.  Yeah, pretty much.

21  Q.  Anything else?

22  A.  Sometimes if a delivery comes in, he will help bring it

23  down the stairs.

24  Q.  And who did the dishes prior to him?

25  A.  My stepfather would come in.  But pretty much we'll have

K997PERT                    Caba - direct

1   everything stacked up.  Sometimes we will go home at one

2   o'clock in the morning, you know.

3   Q.  Sorry, I apologize.  When you say go home one o'clock in

4   the morning, how did that relate to Mr. Perez's job?

5   A.  No, you said prior to that.  We would do it.

6   Q.  So you are saying you wouldn't get home until one o'clock

7   in the morning because there were so much dishes to clean?

8   A.  Correct.

9   Q.  And who did it after Mr. Perez?

10  A.  Nobody.

11  Q.  This was the first time you had ever hired a dishwasher in

12  the course of dealing with the restaurant?

13  A.  Yeah.

14  Q.  OK.  And how many hours during the one week that he worked

15  there did he work?

16  A.  He probably worked, let me see, probably about 38 hours to

17  40 hours.

18  Q.  And what do you base that upon?

19  A.  Because he was scheduled from 11 to 7, and sometimes if it

20  was slow maybe like you know, he could go home 6:30 or so, you

21  know.

22  Q.  So it's your testimony -- I just want to make sure I

23  understand it -- that there were approximately 38 to 40 hours

24  worth of dishwashing for Mr. Perez to do, but this was the

25  first time you had ever hired a dishwasher, and you have not

K997PERT                      Caba - cross

1   hired a dishwasher since.

2   A.  Correct.

3           MR. ARONAUER:  I have no further questions.

4           THE COURT:  Mr. Chun?

5   CROSS EXAMINATION

6   BY MR. CHUN:

7   Q.  Good morning, Ms. Caba.

8   A.  Good morning.

9   Q.  This Rossy's Bakery & Coffee Shop, would you classify this

10  as a family-run business?

11  A.  Yes.

12  Q.  And you said that cakes are baked to order.

13  A.  Correct.

14  Q.  Has that always been the policy?

15  A.  Yes.

16  Q.  So if any one of us went there right now, we wouldn't find

17  any cakes to purchase.

18  A.  Correct.

19  Q.  So you're here now in court today.  So is the restaurant or

20  store open now?

21  A.  Yes.

22  Q.  And who is --

23  A.  My brother is there.

24  Q.  Who is doing that?  OK.

25          Would you say that you at the store, you do whatever

K997PERT                        Caba - cross

1   needs to be done at the store?

2   A.  Yes.

3   Q.  Or you consider yourself a jack of all trades.

4   A.  Correct.

5   Q.  OK.  And for your mother before she retired, would you say

6   that she was also a jack of all trades?

7           MR. ARONAUER:  Objection.  Leading.

8   A.  Yes.

9           THE COURT:  Overruled.

10  Q.  And for your stepfather, would you say that at the time he

11  was working before he retired, was he a jack of all trades for

12  this store?

13  A.  Yes.

14  Q.  And for your brother, would he say that he was a jack of

15  all trades?

16  A.  Kind of, yeah, whatever needed, but not like in the

17  kitchen-wise.

18  Q.  OK.  Let's put some names here with this.  Can you tell us

19  what your mother's name is?

20  A.  Norma Ortiz.

21  Q.  And what is your stepfather's name?

22  A.  Juanito Escalante.

23  Q.  And what is your brother's name.

24  A.  Gabriel Escalante.

25  Q.  You were asked about baker 1.

K997PERT                    Caba - cross

1    A.   Um-hum.

2    Q.   Do you know the name for baker 1?

3    A.   I'm going to say Raquel Vasquez.

4    Q.   And what about baker 2?

5    A.   Camelia Pena.

6    Q.   Did Ms. Vasquez or baker 1 work in 2017?

7    A.   Yes.

8    Q.   And did baker 2, Camelia Pena, work in 2017?

9    A.   Yes.

10   Q.   I want to show you what is marked as Exhibit 2, the tax

11   return for 2017.

12           THE COURT:  Defendant's 2?

13           MR. CHUN:  Yes.

14           THE COURT:  It's not in your binder.

15           MR. CHUN:  May I approach?

16           THE COURT:  You may approach.

17   Q.   Did you file a tax return for the company in 2017?

18   A.   Yes.

19   Q.   And who provided the information to the accountant?

20   A.   I did.

21   Q.   OK.  All right.  And is this an accurate copy of the

22   information that was provided and the tax return that was

23   generated?

24   A.   Yes.

25   Q.   And did you review this tax return before it was filed?

K997PERT                         Caba – cross

1    A.  Yes.

2    Q.  OK.  And did you approve or authorize the accountant to

3    file the information that's included in this form?

4    A.  Yes.

5    Q.  For the year 2017, what, if anything, did you use for

6    payroll recordkeeping?

7    A.  I'm sorry?

8    Q.  In the year 2017 what did you use for payroll

9    recordkeeping?

10   A.  A payroll company.

11   Q.  OK.  And how did that work?  Please tell us.

12   A.  I have it set up that they will process it every week.

13   Q.  And do you have access -- do you input the information into

14   the program?

15   A.  I call them.

16   Q.  You call them.  OK.  And you have access to receive copies

17   of any records or payroll records?

18   A.  Yes.

19   Q.  And in the course of your business in 2017 did you ask for

20   or receive any payroll records?

21   A.  Yes.

22   Q.  For your record-keeping purposes?

23   A.  Yes.

24   Q.  Let me show you Defendant's Exhibit 1.  Is that generated

25   by the company, or do you print that out?

K997PERT                    Caba – cross

A.   That's generated by the company.

Q.   OK.   Now I want to go to this Labor Law decision from

Exhibit D.

          THE COURT:  Plaintiff's Exhibit D.

          MR. CHUN:  Sorry, Plaintiff's Exhibit B in the binder.

Q.   Now, with respect to the calculations for wages, there was

only a shortfall, it looks like, for Genesis Collado, correct?

A.   Yes.

Q.   Did you provide Exhibit 1, the payroll records, to the

Department of Labor?

A.   Yes.

Q.   Were you ever asked any follow-up questions or asked for

more records regarding your payroll, your salary?

A.   No.

Q.   Were you ever requested any records or documents with

regard to the payments made to your mother?

A.   No.

Q.   And what about for your father -- or stepfather -- were you

asked for any further records or documents with respect to his

payments?

A.   No.

Q.   And for your brother, were you asked by the Department of

Labor for further records or documents with regards to his

hours?

A.   No.

K997PERT                        Caba - cross

Q.  Did you file anything for payroll records in Exhibit 1 with

respect to your son?

A.  No.

Q.  And for the year 2017 -- that's Exhibit 1 -- the payroll

records there accurately reflect the employees who were working

at your store for that year?

A.  Yes.

Q.  OK.  And I notice that the plaintiff's name is not there;

is that correct?

A.  Correct.

        THE COURT:  With respect to the Department of Labor

investigation, did they ask for information about any of the

other employees listed on Exhibit 1, like Mr. Escalante,

Ms. Pena?

        THE WITNESS:  Like any additional information?

        THE COURT:  Yes.

        THE WITNESS:  No.

        THE COURT:  Thank you.

Q.  Did the Department of Labor ask any questions specifically

about Mr. Perez?

A.  No.

Q.  Did your mother ever raise an issue with you regarding

payment?

A.  No.

Q.  Did your stepfather ever raise any issues with you

K997PERT                    Caba - cross

1    regarding his weekly payments?

2    A.  No.

3    Q.  And did your brother raise any issues regarding how much he

4    was being paid per week?

5    A.  No.

6    Q.  Now, with respect to Mr. Perez, who came up with the amount

7    that he was to be paid for his work?

8    A.  I came up with the amount.

9    Q.  OK.  And he then said, yes, I will take this amount?

10   A.  Yes.

11   Q.  OK.  And so he worked that week.

12   A.  Correct.

13   Q.  And then whose idea was it for him to be paid in cash?

14   A.  It was my idea just so that he can have some cash.

15   Q.  Did he request a check or money order or different form of

16   payment?

17   A.  No.

18   Q.  Did he request -- he got paid.

19   A.  Yes.

20   Q.  And did he request a receipt or any form of written

21   documentation for this payment?

22   A.  No.

23   Q.  And you had said that you had requested from him paperwork

24   such as a Social Security number.

25   A.  Resident card.

K997PERT                         Caba - cross

1   Q.  And that was for what reason?

2   A.  So I could file the payroll, to put him on payroll.

3   Q.  To put him on payroll.  And then he would have appeared as

4   one of the names in Exhibit 1?

5   A.  Correct, and he would have been paid by check.

6   Q.  So after this time that he worked, were you satisfied with

7   his performance?

8   A.  He worked -- he worked good.

9           THE COURT:  Sorry?  Did Mr. Perez provide you with a

10  resident card and a Social Security number?

11          THE WITNESS:  No.

12          THE COURT:  He did not.

13          THE WITNESS:  No.

14  Q.  So at the end of the week it was your intention to make him

15  more of a permanent staff or put him on payroll?

16  A.  Right.  When I paid him that Saturday, I told him, to do

17  the paperwork, to bring it in that Monday.

18  Q.  And did you think it was his intention to continue to work

19  for you?

20  A.  Yeah, I thought so.

21  Q.  And his last day of work was Saturday; is that correct?

22  A.  It was Saturday.

23  Q.  And then you told him after you paid him to come on Monday

24  with the paperwork?

25  A.  Correct.

K997PERT                         Caba - cross

1    Q.  And did he show up on Monday?

2    A.  No, he called.

3    Q.  And what did he say?

4    A.  He said that he was not going -- he wasn't able to provide

5    the paperwork but that he would work and I will have to pay him

6    the minimum in cash.

7    Q.  And what did you say in response to this?

8    A.  And I told him, no, that he needed to go on payroll, that I

9    just did it that one time so he could have the cash.  And he

10   was like, no, I can't do it, you know, it needs to be cash.  So

11   I just wanted to get off the phone.  I said let me think about

12   it.  And I never heard back from him until the beginning of the

13   next year.

14   Q.  You never heard from him.  Did you ever contact him?

15   A.  No.

16   Q.  Now, you stated that his hours were from 11 to about 7; is

17   that correct?

18   A.  7, um-hum.

19   Q.  What time did the store close?

20   A.  8 o'clock.

21   Q.  OK.  Tell us, what does that mean when the store closes at

22   8 o'clock.  What happens at 8 o'clock?

23   A.  We close the door, and whatever is left in the front on the

24   steam table is brought back to the back, and that's it.

25   Q.  So, in other words, 8 o'clock does not mean the gates are

K997PERT                        Caba – cross

1   down and everybody is outside going home?

2   A.  No, because we have to do the money and stuff like that.

3   Q.  OK.

4   A.  Prep.

5   Q.  And so when it's 8 o'clock, would you have any of your

6   nonfamily people at the store?

7   A.  No, they walk out.

8   Q.  After 8 o'clock.

9   A.  Um-hum.

10  Q.  Now, you said your hours, you open at 8 o'clock.

11  A.  Correct.

12  Q.  So that means what time do you get to the store?

13  A.  About 6.

14  Q.  OK.  So 8 o'clock means the doors are open and you're ready

15  to serve the people.

16  A.  Correct.

17  Q.  Now, is this a self-serve for the food?

18  A.  No.

19  Q.  OK.  People have to request what they want.

20  A.  Right.

21  Q.  And the items are visible for the people to decide?

22  A.  Yes.

23  Q.  All right.

24  Q.  And who usually opens the store?  Or in 2017 specifically

25  who opened the store?

K997PERT                      Caba - cross

1    A.  Myself.

2    Q.  OK.  And what work was done when you opened the store?

3    A.  Fried empanadas, you know, bring up the food, throw it in

4    the oven, monitor, get it ready, put them in steam pans.

5    Q.  Would you require in 2017 any of the nonfamily employees to

6    be there prior to 8 o'clock?

7    A.  After?

8    Q.  No, prior to 8 a.m.

9    A.  Oh, no, no.

10   Q.  In 2017 you said that you had a cashier; is that correct?

11   A.  Correct.

12   Q.  And who was that cashier?

13   A.  Gabriel, my brother.

14   Q.  Now, when you say he was the cashier, does that mean that

15   he was just manning the cash register?

16   A.  No.  He could, you know -- he was mainly there when he

17   needed to be, but he could have served a plate of food or

18   stuff, or bring some stuff up that we needed upstairs.

19   Q.  What does that mean bring some stuff up?

20   A.  Like cups, plates, condiments.

21   Q.  So basically would you say that in 2017 your employees

22   could have served the food, then bagged it for take-out and

23   then rang them up -- one person could have done all of that at

24   the same time?

25   A.  Yes.

K997PERT                    Caba - cross

1          MR. ARONAUER:  Your Honor, objection.  It's leading

2    question after leading question after leading question.  I'm

3    trying to control myself but it's really becoming a bit much.

4          THE COURT:  That's a bit of a leading question.  So if

5    you could rephrase the question, Mr. Chun.

6    Q.  In 2017 your employees, were they limited to just one

7    aspect of the work that needs to be done at the store?

8    A.  No.  You know, like you said, you could serve the food,

9    pack it up.  If my brother is not there, they could ring it up

10   themselves, get supplies out there, whatever was needed, cups,

11   paper, whatever, maybe milk.

12   Q.  And you said that Mr. Perez in addition to being a

13   dishwasher would also do deliveries, if necessary.

14   A.  No, he will bring down the deliveries.  Whatever supplies

15   we have at the store, it will be dropped at the front, so we

16   have the basement door and then we just bring it down into the

17   bakery.

18   Q.  And what did Mr. Perez do with respect to that?

19   A.  Help bring it down, then he will go back upstairs to dish

20   washing.

21   Q.  Did you in 2017 have orders that needed to be delivered,

22   food that was requested and then delivered to another location?

23   A.  Very rare.  You know, at that time it wasn't real we

24   weren't really into deliveries like that.

25   Q.  Do you recall in 2017 who did those deliveries?

K997PERT                    Caba – cross

1    A.  Well, we would do something local, so if my brother was

2    around, he will go across the street or down the block.

3    Nothing crazy.

4    Q.  Do you recall if Mr. Perez ever did that?

5    A.  No.

6    Q.  Is Genesis Collado still working at the store?

7    A.  No.

8    Q.  When did she stop working?

9    A.  Maybe like two years ago.

10            MR. CHUN:  Thank you.  I have nothing further.

11            THE COURT:  Mr. Aronauer?

12            MR. ARONAUER:  Could I take a few seconds, your Honor?

13            THE COURT:  Of course.  Actually this might be a good

14   time for us to take a brief ten minute break all together.  So

15   we can go off the record and everyone can be back at 10:55.

16   OK?

17            MR. ARONAUER:  Yes, your Honor.

18            (Recess)

19            THE COURT:  Ms. Caba, can you rejoin us, please.

20   Thank you.

21            Mr. Aronauer, are you prepared to proceed with any

22   recross?

23            MR. ARONAUER:  Your Honor, I will not be doing any

24   recross.

25            THE COURT:  OK.  All right.

K997PERT                         Perez - direct

1              Mr. Chun, anything further for Ms. Caba?

2              MR. CHUN:  No, not at this time.

3              THE COURT:  So sorry to make you come all the way back

4    up here, but you can go ahead and take your seat next to

5    Mr. Chun.

6              OK.  Who is your next witness, Mr. Aronauer?

7              MR. ARONAUER:  Mr. Perez.

8              THE COURT:  OK.  And we will have Mr. Cruz come up.

9     RAFAEL PEREZ,

10         called as a witness by the plaintiff,

11         having been duly sworn, testified as follows:

12             DEPUTY COURT CLERK:  Please state your full name and

13   spell your last name for the record.

14             THE WITNESS:  Rafael Perez.  P-e-r-e-z.

15             DEPUTY COURT CLERK:  Thank you.

16             THE COURT:  Thank you.

17             Please proceed, Mr. Aronauer.  And just remember that

18   we are translating, so if you can go a little bit shorter with

19   your questions so we can get everything on the transcript.

20             MR. ARONAUER:  Yes, your Honor.

21   DIRECT EXAMINATION

22   BY MR. ARONAUER:

23   Q.  Good morning, Mr. Perez.

24   A.  Good morning.

25   Q.  Where were you raised?

K997PERT                          Perez – direct

1   A.   In the Dominican Republic.

2   Q.   What is your highest level of education?  What is your

3   highest level of education?

4   A.   Fifth grade.

5   Q.   When did you come to America?

6   A.   August 30, 1985.

7   Q.   When you arrived in America, did you speak English?

8   A.   No, I did not, just Spanish.

9   Q.   Currently?

10  A.   Just Spanish.

11  Q.   Currently on a scale of one to ten, what is your

12  understanding of English?

13  A.   I'd say maybe a three.

14  Q.   And in 2017, was it a three then as well, or something

15  different?

16  A.   Yes, the same, a three.

17  Q.   OK.  How old are you?

18  A.   55 years old.

19  Q.   Since arriving in America, what type of jobs have you held?

20  A.   I worked as a dishwasher, and also temporarily as a porter

21  in buildings.

22  Q.   Why did you come to America?

23  A.   I was in search of a better life in this country.

24  Q.   Are you familiar with Rossy's Bakery?

25  A.   No.

K997PERT                          Perez – direct

1    Q.  Are you familiar with the individual defendant who is here

2    today?

3    A.  No.

4    Q.  Why are you here today?

5    A.  I'm claiming a better wage that she did not pay me.

6    Q.  Who is she?

7    A.  Well, she told me that she was the owner.

8    Q.  I'm sorry.  Who is she?

9    A.  She is the person that gave me the job.  She said that she

10   was the owner.

11   Q.  Could you point to the individual defendant.

12   A.  Ms. Rossy.

13   Q.  Do you know her last name?

14   A.  No, that's the only name I ever knew her by.

15         MR. ARONAUER:  Let the record reflect that my client

16   the plaintiff did point to the individual defendant.

17         THE COURT:  Yes.

18         MR. ARONAUER:  Just one second, your Honor.  I

19   apologize.

20   Q.  At any point in time, did you work for the individual

21   defendant Rossy?

22   A.  I worked for her for a total of ten months in 1917.

23   Q.  OK.  Do you recall the year that you worked for her?

24   A.  1917.

25   Q.  OK.  Did you interview with Rossy?

K997PERT                          Perez - direct

1    A.  It was a brief interview when I answered.

2    Q.  Can you tell me a little bit about the interview.

3    A.  She told me that I would work from 11 to 9:30, and that I

4    would have a half hour break and she would pay me $450 -- or

5    475.

6    Q.  How many days a week?

7    A.  Six days.

8    Q.  OK.  What year is it now?

9    A.  1920.

10   Q.  And did she say she would pay you by cash or by check?

11   A.  She said I'll pay cash.

12   Q.  And what did you say in response?

13   A.  I said OK.

14   Q.  Did she talk to you about overtime?

15   A.  She never said anything else about overtime.

16   Q.  Well, did she say anything about overtime?

17   A.  She did not.

18   Q.  OK.  Did she talk to you about what your hourly rate would

19   be?  Or did she just say that you would be paid by the week?

20   A.  She said that she would pay me a salary, that that was the

21   amount of money that she would pay me for the hours worked.

22   She paid me that for six months, and then after that she paid

23   me $500.

24   Q.  OK.  And how long ago was that?

25   A.  Well, I worked there for ten months.

K997PERT                          Perez - direct

1    Q.  No, but did you work there a year ago?  Two years ago?

2    Three years ago?  Something else?

3    A.  More or less a little over two years ago.

4    Q.  And just for a total of ten months.

5    A.  Ten months.

6    Q.  OK.  And when you were hired by Rossy, did she ask for any

7    documentation, for example, a tax ID or Social Security number?

8    A.  She never asked me for any documents.

9    Q.  What were your job duties at Rossy's Bakery?

10   A.  I was a dishwasher.  I also helped to prepare meats, and

11   whenever deliveries arrived, I would assist in bringing them

12   in.

13   Q.  I understand that Rossy talked to you about what your

14   schedule would be, but my question is now what ended up being

15   your work schedule at Rossy's?

16   A.  I worked 63 hours during the week.

17   Q.  OK.  Could you give the Court, please, a schedule of the

18   hours you worked, when you arrived and when you left.

19   A.  I would arrive at 11 in the morning and would leave at 9:30

20   in the evening.

21   Q.  And did that ever deviate?

22   A.  No, it was always the same schedule.  It never varied.

23   Q.  And did you work the same amount of days per week?

24   A.  Yes, always the same thing.

25   Q.  And were you paid by Rossy?

K997PERT                          Perez - direct

1  A.  Yes, she is the person that always paid me.

2  Q.  OK.  And when did she pay you?

3  A.  On Saturdays.

4  Q.  OK.  And how would she pay you?  Would she pay you by

5  check, or by cash, or by something else?

6  A.  Cash, always cash.

7  Q.  OK.  And when she gave you the cash, did she include

8  anything with it?

9            THE INTERPRETER:  Sorry, I didn't hear the question.

10  Q.  When she paid you the cash, did she give you anything else

11  with the cash, for example, a notation of the hours that you

12  worked?

13  A.  No, never.  She just gave me the money, nothing else, no

14  paper at all.

15  Q.  OK.  And there came a time -- strike that.

16            You're not currently working at Rossy's.

17  A.  No.

18  Q.  Why did your employment at Rossy's cease?

19  A.  Because I finally made a demand that she pay me a fair

20  salary, and she said, no, I will let you know if anything

21  changes.  It's because I made that claim to her that I was told

22  to go home.

23  Q.  When you say a fair salary, what do you mean?

24  A.  That I should be paid an hourly wage according to the law.

25  Q.  Is this the only lawsuit that you filed with respect to a

K997PERT                        Perez - direct

1    claim of unpaid wages?

2    A.   I had another claim for the same reason, because I was not

3    being paid a fair wage.

4    Q.   Are you a serial filer?

5             MR. CHUN:   Objection.

6    A.   No, I'm not.

7             THE COURT:   Overruled.   The objection is overruled.

8    He can answer.

9    A.   No, I'm not, but if I'm not being paid a fair wage, then

10   what should I do?

11   Q.   Do you have any physical proof in your possession that you

12   worked at Rossy's for more than a week?

13   A.   No, I was only paid cash.   The only thing I was ever given

14   was the money itself.   I was never given any paper or anything

15   else.

16   Q.   Prior to today, did you identify any other individuals who

17   also worked at Rossy's when you were there?

18   A.   I know that her mother worked in the kitchen as a

19   supervisor, Norma.   There is a cook by the name of Jose.   There

20   was a lady by the name of Magaly that worked on making cakes.

21   There were a lot of people there.

22            Another gentleman that prepared things, his name was

23   Nano, at least that's the name that I knew him by.

24   Q.   Are you saying -- just to be clear, is Nano a nickname or

25   is it a real name?

K997PERT                      Perez - cross

1   A.  I really don't know, other than to tell you that everybody

2   called him by that name.

3   Q.  Do you have anything in writing with respect to the hours

4   that you worked at Rossy's?

5   A.  No, I was paid in cash, so there is no other proof other

6   than I was paid in cash.

7   Q.  At any point in time did Rossy ever give you anything

8   during the time period that you worked for her?

9   A.  No, the only thing she gave me was my pay on Saturdays,

10  that's it.

11  Q.  When you first started working for Rossy's, was it cold

12  out?  Was it warm?  Or was it something else?

13  A.  It was cold.

14  Q.  OK.  And when you stopped working for Rossy's, do you

15  remember the season?  Were the leaves changing?  Or was there

16  snow on the ground?  Or was it very hot and humid?  Or was it

17  something else?

18  A.  It was so so, kind of like now.

19          MR. ARONAUER:  I have nothing further.

20          THE COURT:  Mr. Chun?

21          Actually, before you do that -- go ahead.  Go ahead.

22  If I have additional questions, I will ask them at the end.

23  CROSS EXAMINATION

24  BY MR. CHUN:

25  Q.  Mr. Perez, good morning.

K997PERT                        Perez - cross

1    A.  Good morning.

2    Q.  Can you hear me?

3    A.  Yes.

4    Q.  You came to the United States August 30, 1985; is that

5    correct?

6    A.  Yes.

7    Q.  And as an immigrant, you know that date better than your

8    birth date, right?

9    A.  I will always remember it.

10   Q.  I understand.  Did you come alone?

11   A.  I came with my two sisters.

12   Q.  And you came straight to New York?

13   A.  Yes.

14   Q.  And have you been residing in New York since you came?

15   A.  Yes.

16   Q.  Do you have any children?

17   A.  Yes.

18   Q.  Do they live with you now?

19   A.  No.

20   Q.  Do they live in the United States?

21   A.  Yes.

22   Q.  Do they live here in New York City?

23   A.  Yes.

24   Q.  Are you in touch with them?

25   A.  Yes, always.

K997PERT                          Perez - cross

1   Q.  Were you in touch with them in 2017?

2   A.  Always.

3   Q.  OK.  Were they born in this country?

4   A.  Yes.

5   Q.  And on the same scale of one to ten, what would you say for

6   your children is their level of English?

7   A.  My children speak perfect English.  They were born here and

8   studied here.

9   Q.  Are they both over the age of 18 now?

10  A.  All three of them are over 18.

11  Q.  OK.  How did you get in touch with Ms. Caba?

12  A.  With who?

13  Q.  Rossy.

14  A.  I was in search of work in that neighborhood.  I entered

15  the business, and she offered me the job.

16  Q.  Do you live in the neighborhood?

17  A.  No.

18  Q.  Do you frequent the neighborhood?

19  A.  No.

20  Q.  So, are you saying that you were there on a particular day

21  and you met Rossy and asked her about a job?

22  A.  I know that there are a lot of businesses and restaurants

23  in that area, and that's the reason I was walking throughout

24  that area, in search of work, and that's why I went into her

25  business.  But back then I used to go to that neighborhood

K997PERT                    Perez - cross

1   more.

2   Q.  In 2017 were you residing in Manhattan?

3   A.  No.

4   Q.  Were you residing in New York City?

5   A.  Yes.

6   Q.  And the neighborhood where you were residing in 2017, were

7   there any restaurants or stores that were run by people who

8   speak Spanish?

9   A.  Yes, some.

10   Q.  OK.  And in 2017 did you work in any of those restaurants

11   or stores near the area where you live?

12   A.  No.

13   Q.  OK.  So, you met Rossy.  Did you ask her for a job, or did

14   she ask you to work for her?

15   A.  I went in and asked, saying that I was looking for work, if

16   they needed anyone.

17   Q.  And then Rossy said she needed somebody.

18   A.  Yes, she said she needed someone.

19   Q.  OK.  And did she tell you that you were going to work from

20   11 a.m. to 9:30 at night six days a week?

21   A.  Yes.

22   Q.  OK.  And then you accepted that.

23   A.  Yes.

24   Q.  And then she told you you were going to be paid $475 per

25   week?

K997PERT                         Perez – cross

1   A.  Yes.

2   Q.  And then you accepted that.

3   A.  Yes.

4   Q.  OK.  What were you doing in terms of work prior to working

5   here for Rossy?

6   A.  I was also a dishwasher.

7   Q.  And where was that?

8   A.  In Queens.

9   Q.  OK.  Did you live in Queens at that time when you were

10  working there?

11  A.  No, I was not living there.

12  Q.  OK.  And then why did you stop working at that place in

13  Queens?

14  A.  The location was sold and closed down; they took everyone

15  out.

16  Q.  And were you paid in cash at that previous location?

17  A.  No, I got paid by check there.

18  Q.  OK.  When you worked for Rossy, did you have her cell phone

19  number?

20  A.  I had the business number.

21  Q.  Did you ever ask her for her cell phone number?

22  A.  No.

23  Q.  So then the first week you worked, you said you worked 63

24  hours.

25  A.  Yes.

K997PERT                          Perez – cross

1    Q.  So you got paid $475 in cash.

2    A.  Yes.

3    Q.  OK.  When you got paid the money, did you tell Rossy that

4    I'm not being paid enough?

5    A.  No, I told her after about ten months.  That's when I

6    finally made the demand.

7    Q.  Did you get paid every week that you worked?

8    A.  Every Saturday.

9    Q.  OK.  Now, when you got paid, did you -- did you take a

10   picture of the money that you received?

11   A.  No.

12   Q.  Did you have any witnesses around you to see that you got

13   paid?

14   A.  No.

15   Q.  Did you send a text message to Rossy?

16   A.  No, I would call her on the business phone.

17   Q.  And did you leave her a message that said that you got paid

18   this much money this week?

19   A.  No.  When I finally told her, I told her directly in

20   person, and she just told me I'll let you know if that happens;

21   and she never called me back.

22   Q.  OK.  So are you saying then for almost the entire ten

23   months you just got paid the money and that's it, you didn't

24   make any mention to her about anything?

25   A.  No, no.

K997PERT                     Perez - cross

1   Q.  Did you ask her to have your hours reduced?

2   A.  No, I just told her when I did that it wasn't enough, and

3   she said no.

4   Q.  Did you ask her what you wanted?

5   A.  I told her she should pay me the minimum wage which is

6   dictated by the law, and she said, no, stay -- she said stay at

7   home, and I will call you if anything.

8   Q.  OK.  Did you write a letter in Spanish and give it to her?

9   A.  No, I called her on the business number -- on the business

10  phone -- and I told her.

11  Q.  You have three children; they all speak English perfectly

12  you said.  Did you ever ask any of your children to maybe write

13  a letter to Rossy?

14  A.  No, because she speaks Spanish, so I just called her.

15  Q.  OK.  Did you ever ask your children to send an e-mail?

16  A.  No.

17  Q.  OK.  Did you ever ask your children to find out any

18  information from Rossy to contact her?

19  A.  No.

20  Q.  You have been living in this country since you came here in

21  August of '85; is that true?

22  A.  Yes.

23  Q.  So, in other words you made it in this country for 35

24  years -- just celebrated 35 years -- and with an English that

25  you say is on a scale of one to ten a three?

K997PERT                        Perez - cross

1    A.  Yes.

2    Q.  OK.  That's commendable, it really is.  So you're able to

3    survive.  So you're able to know -- strike that.

4           You have learned a lot in 35 years of living in this

5    country about how to survive in this country.

6    A.  I have always worked.

7    Q.  Yes.  And even after this job with Rossy, you worked; isn't

8    that correct?

9    A.  Yes.

10   Q.  You worked for Arsi's Patisserie?

11   A.  Sorry?

12   Q.  Arsi's Patisserie.

13   A.  Yes.

14   Q.  And where was that in what county?

15   A.  In Queens.

16   Q.  And is it not true -- well, what was your -- what was your

17   hourly pay there?

18   A.  $10 per hour.

19   Q.  And how many hours did you work?

20   A.  There I worked 54 hours.

21   Q.  OK.  And was the $10 per hour considered for you a fair

22   salary then?

23   A.  It wasn't fair either.  It wasn't enough, not for what I

24   was doing.

25   Q.  OK.  But when you first got that job, were you told or did

K997PERT                        Perez - cross

1   you -- were you told it was going to be $10 an hour for 54

2   hours a week, or did you request that?

3   A.  No, that was what the offer was.

4   Q.  And you accepted that.

5   A.  I accepted it.

6   Q.  And there came a time that you left that job, right?

7   A.  Well, I made a demand asking to be paid a fair wage, and

8   them said, no, that that's what they paid.

9   Q.  And when did you make that demand in relation to your job

10  over there?

11  A.  That was last year, 1919?

12  Q.  So, was that more than ten months after you were working at

13  that location?

14  A.  Yes, I believe I worked over a year there.

15  Q.  OK.  Well, when did you think that you were working an

16  unfair wage at that location?  From the minute you started

17  working there?

18  A.  No, I didn't make a demand about getting more until -- not

19  until the time that the minimum wage was increased to $15.  And

20  that's when I asked for it.

21  Q.  OK.  Is it true that you filed a lawsuit against Arsi's

22  Patisserie?

23  A.  Yes.

24  Q.  And do you recall who your lawyer was for that?

25  A.  The same gentleman that's here now.

K997PERT                        Perez - cross

1   Q.  OK.  So are you telling us that you worked here for Rossy

2   for ten months, and then you told her it wasn't a fair wage,

3   then she told you not to come back, and then you take a job in

4   another county and worked there for over a year and then make a

5   complaint?

6   A.  Yes, I made a complaint finally because I was not happy

7   with the amount of money that I was then getting paid for the

8   hours that I was working and the work that I was doing.

9   Q.  OK.  I want to go back to the time when you first met Rossy

10  and you were talking with her about a job.  Did you go and look

11  at any other place on East 3rd Street for a job?

12  A.  I went into other locations looking for work, but they

13  didn't have any work available, but when I went into her

14  business she offered me the job.

15  Q.  Now, there is East 2nd Street.

16  A.  There are a lot of businesses in that whole area.

17  Q.  OK.  Now, that was only just one section of Manhattan.  How

18  long was it that you were looking for work?

19  A.  I had been searching for work for about a month in

20  different areas.

21  Q.  Now, the money that you were paid each week, did you

22  deposit that into the bank?

23  A.  No, I would use it to cover my expenses.

24  Q.  OK.  Did you deposit any of it in the bank?

25  A.  No, I just used it for myself, for my bills, for my rent,

K997PERT                          Perez - cross

1    for my food, everything.

2    Q.  Did you have a bank account in 2017?

3    A.  Yes, I have one.

4    Q.  Did you file tax returns for the year 2017?

5         MR. ARONAUER:  Objection.  Your Honor there has been

6    ample case law on this in terms of wage and hour cases asking

7    immigrants whether or not they've paid taxes.

8         THE COURT:  Well, he asked whether he filed a tax

9    return.  That's not the same question as whether he paid taxes.

10   So I will allow the question.

11        You can answer the question, sir.

12   A.  I called the IRS, and they told me to prepare the paperwork

13   and to have her sign it, indicating that I worked there.

14        THE COURT:  Who is her?

15        THE WITNESS:  To Rossy's Bakery so that they could

16   sign it.

17   Q.  OK.  And did you give it to her?

18   A.  No, they said that they would send it to her.

19        THE COURT:  The they in that question is the IRS?

20        THE WITNESS:  The IRS told me that they would send it

21   to her.

22        THE COURT:  And when did this phone call with the IRS

23   take place?

24        THE WITNESS:  That was like in January, when it was

25   time to file taxes, in the year 2019.

K997PERT                        Perez - cross

1    Q.  Did you follow up with the IRS?

2    A.  I called them, and they told me that they would send her

3    correspondence directly so that I could pay the taxes.

4    Q.  Did you ask your children to follow up with the IRS?

5    A.  No.

6    Q.  Did you ask your children to assist you in any regard with

7    respect to payments from Rossy?

8    A.  No, no.

9    Q.  Did you ever ask Rossy for a W-2 or a 1099?

10   A.  I'm not sure what the form was, whether it was a 1099 or

11   not.  They were the ones that were going to send it to her.

12   They didn't tell me the name of the form, but they told me that

13   they would send her the form.

14   Q.  But did you ask Rossy for tax documents?

15   A.  I called her, and she said, no.  She said, I'm going to say

16   that you didn't work here.  She said, I'm not going to help you

17   with that.

18   Q.  Did you provide your information to her?

19   A.  I said, Rossy, I need to pay my taxes; I need you to sign

20   this.  And she said, no.  Then I called the Department of

21   Labor, and they said, don't worry, we'll send that to her, and

22   she will have to sign it.

23   Q.  You called the Department of Labor.

24   A.  Yes, because I pay my taxes.

25   Q.  Did you submit a copy of your tax return to your attorney?

K997PERT                    Perez - cross

A.  No, the Department of Labor said that they would handle it:
They said that they would send the papers so that they could be
signed.  They said I didn't have to do anything else.

Q.  The Department of Labor told you that you did not have
to -- that you -- strike that.

        Did the Department of Labor tell you you did not have
to file a tax return?

A.  They said file your return and send it to us, and we will
have her sign it.

Q.  OK.  And is that what you did?  Did you file your tax
return?

A.  Yes, and I sent it to them.

Q.  Did you do that yourself?  Or did you have an accountant
prepare the tax return?

A.  I went to a person that does that, to an accountant.

Q.  OK.  Did you ask the accountant to request information from
Rossy?

A.  He said you have to call her to see what she is going to
say.  And when I called her, that's what she told me.

Q.  Did you bring your tax return here with you here today?

A.  No, I did not.

Q.  I'm sorry.  Did you give it to your attorney at any point?

A.  No.

            MR. CHUN:  Just a moment.

            THE COURT:  Go ahead.

K997PERT                    Perez - redirect

1              MR. CHUN:  I have nothing further.

2              THE COURT:  OK.  Mr. Aronauer, any redirect?

3              MR. ARONAUER:  Yes, very brief.

4    REDIRECT EXAMINATION

5    BY MR. ARONAUER:

6    Q.  Mr. Perez, you were asked about your salary by defendant's

7    counsel at Rossy's.  Did you receive the same weekly rate the

8    entire time you were there?

9    A.  No.  After six months I got an increase to $500.  That went

10   on for about four months that I was receiving $500.

11   Q.  And did Rossy tell you why she was increasing the weekly

12   rate?

13   A.  No, she didn't say.

14   Q.  Did your work schedule change?

15   A.  No.

16             MR. ARONAUER:  Nothing further.

17             THE COURT:  Mr. Perez, I have a couple of questions

18   for you.

19             In 2017, which neighborhood were you living in?

20             THE WITNESS:  In Brooklyn.

21             THE COURT:  You testified earlier that you entered

22   Rossy's Bakery and spoke to Rosie about a job.  How long after

23   you had that first meeting did you started working at Rossy's?

24             THE WITNESS:  The following day, the next day.

25             THE COURT:  And how did you get to work while you were

K997PERT                          Perez – redirect

1    working at Rossy's Bakery?

2              THE WITNESS:  On the train.

3              THE COURT:  During the ten months in 2017 that you

4    said you were working at Rossy's Bakery, did you have another

5    job?

6              THE WITNESS:  Could you repeat the question?

7              THE COURT:  Sure.  During the ten months in 2017 that

8    you worked at Rossy's Bakery, did you have another job at the

9    same time?

10             THE WITNESS:  No, I did not have another job at the

11   same time.

12             THE COURT:  And I am sorry if you testified about this

13   already, but before you started working at Rossy's, what job

14   were you working at?

15             THE WITNESS:  Before Rossy's?

16             THE COURT:  Yes.

17             THE WITNESS:  A dishwasher also.

18             THE COURT:  And where was that?

19             THE WITNESS:  It was a place close to Murtle Avenue in

20   Queens.

21             THE COURT:  And when did you stop working there?

22             THE WITNESS:  I think it was in 2016.

23             THE COURT:  So at the time you were not employed at

24   Rossy's were you not employed anywhere?

25             THE WITNESS:  No.

1            THE COURT:  And how long had you not been working

2    before you began working at Rossy's?

3            THE WITNESS:  Maybe one or two months.

4            THE COURT:  And I think you said that you stopped

5    working at Rossy's in the fall of 2017; is that right?

6            THE WITNESS:  More or less like October, like October

7    2.

8            THE COURT:  And what job did you have after Rossy's?

9            THE WITNESS:  Arsi's Bakery.

10           THE COURT:  And when did you start working there?

11           THE WITNESS:  Maybe two weeks after I stopped working

12   at Rossy's.  No, I'm sorry, I started to work there in January,

13   actually.

14           THE COURT:  OK.  Do you know someone named Genesis

15   Collado?

16           THE WITNESS:  She worked at Rossy's, yes.

17           THE COURT:  And what job did she have at Rossy's?

18           THE WITNESS:  She worked at the front serving

19   customers.

20           THE COURT:  And did you know her before you started

21   working at Rossy's?

22           THE WITNESS:  No, after I started working there.

23           THE COURT:  OK.  And are you still -- did you become

24   friends with her?

25           THE WITNESS:  Not friends.  We spoke.

1           THE COURT:  OK.  I don't think I have any further

2    questions.

3           Mr. Aronauer or Mr. Chun, anything further for

4    Mr. Perez?

5           MR. ARONAUER:  No, your Honor.

6           MR. CHUN:  No.

7           THE COURT:  OK, Mr. Perez, you can step down and take

8    a seat next to your attorney.

9           (Witness excused)

10          THE COURT:  Mr. Aronauer, do you have another witness?

11          MR. ARONAUER:  Your Honor, I don't think I do.  I

12   apologize for being a little bit informal as to this issue, but

13   based upon the questions raised by Mr. Chun, I am tempted to

14   ask Mr. Chun to take the stand just to ask him one question,

15   that is, did he serve plaintiff with any document requests.  I

16   think it's relevant based on the questions that he asked my

17   client.  I would like to avoid doing that.  I would just ask if

18   the parties could stipulate to the fact that the defendants did

19   not serve the plaintiff with any discovery requests.

20          THE COURT:  I mean, Mr. Chun is an attorney in this

21   case, not a witness.  Why didn't you ask Mr. Perez?  Why don't

22   you ask your client whether he received any document requests?

23   That would answer the same question.

24          MR. ARONAUER:  He would not be able to answer that.

25          THE COURT:  Why not?

1          MR. ARONAUER:  Because I didn't receive them, I didn't

2     discuss it with him.

3          THE COURT:  So if you didn't receive them, then it

4     didn't happen.  And why is that relevant to the legal questions

5     that the Court needs to decide?

6          MR. ARONAUER:  Well, there were various questions by

7     Mr. Chun with respect to bank records and tax returns, and I

8     don't know how much the Court is going to weigh it, but I think

9     it's relevant that that was never asked from us.

10          THE COURT:  Well, we will talk about that when we get

11     to post-trial submissions, but it seems to me calling Mr. Chun

12     as a witness is entirely inappropriate, especially since he was

13     not listed in your pretrial submissions and I don't see any

14     basis in any of the testimony that's happened here today to be

15     calling a lawyer in this case as a witness.

16          MR. ARONAUER:  Yes, your Honor.

17          THE COURT:  OK.  So does the plaintiff rest its case

18     at this point?

19          MR. ARONAUER:  Yes, your Honor.

20          THE COURT:  OK.  Mr. Chun?

21          MR. CHUN:  I would like to call Ms. Caba.

22          THE COURT:  OK, Ms. Caba, can you come back up,

23     please.

24          Let me just first ask you before you come up,

25     Mr. Chun, how much time do you think you will be questioning?

K997PERT                        Caba - direct

1            MR. CHUN:  Five minutes.

2            THE COURT:  OK.  Go ahead.

3            Come up.  If it was going to be a long time, I might

4     have us take a short break.  But please go ahead.

5      ROSELIA CABA,

6     DIRECT EXAMINATION

7     BY MR. CHUN:

8     Q.  Ms. Caba, good morning.  You heard Mr. Perez discuss a

9     person named Magaly?

10    A.  That is Camelia Pena.

11    Q.  Who is Camelia Pena?

12    A.  One of the bakers.

13    Q.  And did you hear about Mr. Perez stating a name Nano?

14    A.  Yes.

15    Q.  Who is Nano?

16    A.  That is Juan Escalante, my stepfather.

17    Q.  Is that a nickname?

18    A.  Yes.

19    Q.  And Magaly, is that a nickname as well?

20    A.  Yes.

21    Q.  And do you recall if you give out your cell phone number or

22    contact information to employees?

23    A.  Yes.

24    Q.  OK.  And what if anything did you do with your contact

25    information for Mr. Perez?

K997PERT                        Caba – direct

1    A.  I'm sorry?

2    Q.  What if anything did you do regarding your contact

3    information for Mr. Perez?

4    A.  What do you mean?  Like I don't understand what you said.

5    Q.  OK.

6    A.  Did he have it?

7    Q.  Yes.  Did he have your contact information?

8    A.  Yes, I had given it to him on a business card, I remember.

9    Q.  OK.  And what was on the business card?

10   A.  The bakery information.  It was the bakery business card.

11   Q.  OK.

12   A.  And on the back it had my cell phone number.

13   Q.  OK.  And how did your cell phone number come on the back of

14   the business card?

15   A.  Well, I told him if there is any changes, or that if he

16   can't make it in, just to call me.

17   Q.  So you wrote down your cell phone number.

18   A.  Yes.

19          MR. CHUN:  Thank you.  I have nothing further.

20          THE COURT:  I have a couple of follow-up questions.

21          Earlier this morning you were asked some questions

22   about the sales at Rossy's Bakery.  What were the weekly sales?

23   How much in dollars would you estimate were Rossy's weekly

24   sales?

25          THE WITNESS:  It would vary.  It would be, you know,

K997PERT                        Caba – direct

1     10,000 or so.

2                  THE COURT:  OK.

3                  THE WITNESS:  You know we had days that were slow, but

4     average could be 1800 or so.

5                  THE COURT:  1800 per week?

6                  THE WITNESS:  No, per day.

7                  THE COURT:  Very good.  I think earlier you testified

8     that Mr. Perez worked at the bakery for a week in July.  Do you

9     remember the dates, the specific dates in July 2017?

10                 THE WITNESS:  No.  It was some time in July.

11                 THE COURT:  Do you remember if it was the beginning,

12    the middle, or the end?

13                 THE WITNESS:  No idea.

14                 THE COURT:  OK.  And also in your testimony earlier

15    this morning you mentioned that we were talking about Genesis

16    Collado.

17                 THE WITNESS:  Um-hum.

18                 THE COURT:  I think you said that she had worked at

19    the bakery as part of a program.  Can you describe what you

20    meant by program?

21                 THE WITNESS:  She was incarcerated, and I had given

22    her a job, but she still needed to turn herself in, I guess, go

23    after work, and they would let her out just the amount of time

24    that she was going to work and then go back in.  So that's why

25    I say I could have appealed it but I just didn't want to go

K997PERT                         Caba - direct

1    through the paperwork.

2            THE COURT:  OK.  And so did you somehow keep track of

3    the hours that she worked at the bakery?

4            THE WITNESS:  Well, we had a letter that was given to

5    her PO, and that was her set schedule.

6            THE COURT:  You mean her probation officer?

7            THE WITNESS:  Yes.  So they would come in, take a

8    look, make sure she was working.

9            THE COURT:  Did you ever meet her probation officer?

10           THE WITNESS:  Yes.

11           THE COURT:  Do you remember that person's name?

12           THE WITNESS:  No.

13           THE COURT:  And so how long was she working in the

14   bakery then?

15           THE WITNESS:  I would say probably about a year or so.

16           THE COURT:  OK.  And there came a time when she

17   stopped working at the bakery?

18           THE WITNESS:  Sorry.

19           THE COURT:  She stopped working at the bakery at some

20   point?

21           THE WITNESS:  Yes.

22           THE COURT:  Why was that?

23           THE WITNESS:  Actually she got another job that was

24   going to pay her work, work more hours I guess.

25           THE COURT:  And did you know her before she started

K997PERT                         Caba - direct

1   working in the bakery?

2              THE WITNESS:  She is from the neighborhood, you know.

3   Not personally.

4              THE COURT:  OK.  So how did she come to start working

5   at the bakery then?

6              THE WITNESS:  She was looking for a job.  She had her

7   resume and stuff.

8              THE COURT:  And you were the one who interview her and

9   hire her?

10             THE WITNESS:  Yes.

11             THE COURT:  OK.  I think those are all the questions

12  that I had.

13             Anything further, Mr. Aronauer for Ms. Caba?

14             MR. ARONAUER:  Plaintiff rests.

15             THE COURT:  Mr. Chun?

16             MR. CHUN:  No.

17             THE COURT:  OK.  You can step down.  Thank you.

18             (Witness excused)

19             THE COURT:  Mr. Chun, anything further?

20             MR. CHUN:  Could I call Ms. Caba back up?

21             THE COURT:  Sure.

22             MR. CHUN:  I thought of something.

23             THE COURT:  Sorry, Ms. Caba, you're getting your

24  exercise today.

25             THE WITNESS:  My work out.

1   ROSELIA CABA,

2   BY MR. CHUN:

3   Q.  Are you aware of the overtime laws in the State of New

4   York?

5   A.  Yes.

6   Q.  And what are they?

7   A.  Well, it's about 40 hours, and it's usually about time and

8   a half or so.

9   Q.  And did anybody -- besides you, is there anybody in 2017

10  that worked overtime?

11  A.  No.  I can't afford it.  It's a small family business, so

12  that's why I have a set salary and hours so I don't have to

13  deal with it.

14  Q.  OK.  Was it your responsibility to tell the people to

15  leave, or did they -- did your employees just leave?  They had

16  to know when it was time to leave.

17  A.  No, they knew the time to leave.  And I said, OK, you guys

18  go.  But sometimes they talked to my brother, or they stayed in

19  the front or they leave right away.  Some of them try to get

20  everything done five minutes before so they're done at that

21  time.

22          MR. CHUN:  OK.  Thank you.  I have nothing further.

23          THE COURT:  Thank you.  Mr. Aronauer?

24          MR. ARONAUER:  No, your Honor.

25          THE COURT:  OK.  You can now step down.

K997PERT                        Caba - direct

1          (Witness excused)

2          THE COURT:  Mr. Chun, anything further?

3          MR. CHUN:  No.

4          THE COURT:  Mr. Aronauer, any rebuttal case?

5          MR. ARONAUER:  No, your Honor.

6          THE COURT:  OK.  So in terms of a closing argument,

7    would the parties like to make that today, or would they like

8    to make submissions in writing?  Mr. Aronauer?  Or do you want

9    to discuss it?

10         MR. ARONAUER:  Can I confer with Mr. Chun?

11         THE COURT:  Yes.

12         MR. ARONAUER:  We will do it orally.

13         THE COURT:  OK.  Would you like to -- how about we

14   take a ten minute break and then we will do closing arguments.

15         I would like a ten minute break if you wouldn't mind,

16   and then we will go back right after that.  OK, so let's come

17   back at 12:05 for closing arguments.  Thank you.

18         (Recess)

19         THE COURT:  Mr. Aronauer, are you prepared to proceed

20   with your closing argument?

21         MR. ARONAUER:  Sorry.

22         THE COURT:  Are you prepared to proceed with your

23   closing arguments?

24         MR. ARONAUER:  Yes, your Honor, I will be brief.

25   First, we have interstate commerce and we have the $500,000

1    threshold.  The individual defendant acknowledged that

2    generally speaking they grossed -- excuse me -- they grossed

3    $10,000 a week during the relevant time period.  And, in

4    addition, she acknowledged that the company accepts credit

5    cards, which the Court will see there have been prior cases

6    that have that dealt with that that shows that interstate

7    commerce has been achieved.

8             I would like to note that obviously the Court has to

9    make a credibility determination.  I think it has bearing that

10   the defendant's tax returns for the year 2017 are vastly lower

11   than what defendant herself testified to today in terms of the

12   gross revenue.

13            Getting to my client's employment at Rossy's Bakery, I

14   don't have that much -- I'm not going to deviate that much from

15   my opening statement.  The testimony here did show that

16   defendants have a history of literally not paying their

17   employees, and in some instances with respect to the

18   defendant's brother paying them a weekly rate even though it's

19   clear that defendant's brother should have been paid hourly.

20            The manner in which defendants have paid their

21   employees led to an investigation by the Department of Labor,

22   which led to a finding of numerous for lack of a better word

23   deficiencies, which led to a monetary fine.

24            My client testified credibly not just with respect to

25   his employment at defendant's but both before and after.  Is he

a sophisticated man?  No, but he is an honest man, and he was

looking for work, and he testified credibly in terms of the

operations of the restaurant and who was at the restaurant in

terms of the other employees.

Everybody in this courtroom knows that the Southern

and Eastern District are flooded with these types of FLSA

cases.  And I understand the arguments made by Mr. Chun, that,

hey, if you don't think you're being paid correctly, just

leave, it's that easy.  But everybody here knows the reality,

that hard working, Spanish-speaking immigrants like himself are

routinely taken advantage of, and this is just another example

of it.

So, to make the argument that, well, if you knew you

weren't being paid correctly you should just leave, well, the

Court saw what happens, that if somebody complains, the

employer just says, hey, if you don't like it, you can go.  And

that's what happened here.

So, based upon the testimony of my client, I think it

is credible, and the Court should find that he worked there for

the time period that he claimed.  And plaintiff rests.  Thank

you.

THE COURT:  Thank you, Mr. Aronauer.

Mr. Chun.

MR. CHUN:  This is a case about unpaid wages.  First,

you have to show that you were actually not paid your proper

K997PERT                          Caba - direct

wages.  There has to be some sort of evidence presented to the
Court to even establish the prongs necessary to even get into
or to prove his case.

          You don't have interstate commerce.

          My client testified that she said it was about $10,000
a week on average that she made.  That's just on average.  We
submitted a 2017 tax return.  We didn't redact anything.
That's exactly what we submitted.  It says here for 2017 she
grossed $312,532.

          We also submitted the payroll information.  And by the
time for July of 2017 it was done on a weekly period for that
month, and it lists the names and what was being paid.  Only
one person was being paid hourly, Genesis Collado.  Everybody
else was being paid a weekly salary.

          This is a family-run business.  With any family run
business, the boss is going to work the most and get paid the
least.

          It is true we did not ask for the tax returns for the
plaintiff, but it is not our burden to prove that he wasn't
paid.  It is the plaintiff's burden to prove that he wasn't
paid.  We don't even have to prove that he was paid.  He has to
prove that.  And he could have had a myriad of ways to do so.

          I understand English is not his first language, but I
also understand the code that immigrants live by, and that's
called survival.  They will do what they have to do to survive.

1      This gentleman has family members that speak English.

2   This gentleman also presumably has friends, some sort of

3   contact to get documentation of what he wanted in terms of any

4   kind of proof.  He could have had another witness there.  He

5   could have tried to find through discovery Genesis Collado, who

6   could have came in and testified on his behalf.

7      I don't have to bring in Genesis Collado to say this

8   did happen.  He would have to bring in Genesis Collado to say

9   this did happen.  That could have helped his case.

10      He could have sent text messages.  He could have done

11   What'sApp chat.  He could have sent something in Spanish.  He

12   could have had translation, a letter written, anything to

13   document this.  I even suggested taking pictures of the actual

14   cash.  Best thing would have been bank deposits, deposit the

15   money in the bank.  Submit a tax return to show something that

16   says, hey, look, this is what I made.  That would have

17   corroborated your Honor's question earlier about whether he

18   worked any other jobs in 2017.  He could have listed an amount

19   of money; that would have been documented as to what he got.

20   He could have done anything.

21      Obviously, if I found money in the street, of course

22   I'm not going to report that.  I don't have any problem saying

23   that on the record.

24      This is money -- this is the problem or I guess the

25   benefit, the double-edged sword about cash.  When you have

1    cash, you can't trace it.  So, the person that needs to show

2    that it was paid, can't do that.

3           If this case were the other way around, about us

4    having to prove that we paid him, we can't prove that.  But we

5    are not the ones bringing this case; we are not the ones with

6    the burden.  He has the burden to show that he was paid a wage

7    and for all the weeks that he worked and that he was underpaid.

8    He didn't show that.  I mean he didn't bring anything to show

9    us that he worked here.

10           Then of all the things he had to say was he lived in

11   Brooklyn at the time, he had a job in Queens before here, then

12   he had a job here in Manhattan, and then he worked in a job in

13   Queens.

14           So, of all the places he could have worked, he looked

15   in this area in the East Village.  In all the places in

16   Manhattan.  And he didn't say anything about looking for

17   anyplace in Brooklyn.  Anyplace.  He was never asked if he had

18   any friends, maybe anybody else that could find work for him.

19   But that's his burden to show that this was the place where he

20   worked.  I mean his whole story about him being credible is not

21   credible.

22           There has been nothing submitted.  The only thing that

23   the Court really has, what the plaintiff is pressing upon, is a

24   negative inference upon the Department of Labor findings.

25   Well, let's look a little deeper at the Department of Labor

findings.  That was based on records.  First, we know that the

plaintiff filed a claim.  His name wasn't even in the findings,

so he didn't even get anything.  He wasn't even -- it's not

like the Department of Labor said, oh, you didn't even report

or provide wage information or hourly information to Mr. Perez.

He wasn't even listed in there.

        The only thing that was based upon the decision was on

the payroll reports.  And he is not on the payroll reports

anywhere.  So, it wasn't even determined that he worked here.

It wasn't even determined how much he got paid.  It wasn't even

determined how many hours he worked.  Because he didn't.  He

can't prove it.

        He never took pictures of him working, or him by the

clock, anything to show that he was working, nothing to back it

up.  I never said that if he didn't like it, he could leave.

But I am intimating that he could have done a lot more than

what he did.  But instead he discovered after ten months he

decided to say something.  Then he takes another job for 54

hours a week -- 54 hours a week at $10 an hour -- and then he

works there for about a year before saying anything.  And he

files a lawsuit there too.

        So, if anything, the negative inference should be upon

the plaintiff for what he is doing, because now that lawsuit

which was filed after this one now certainly shows that he has

knowledge about what to do and how to do it.

K997PERT                          Caba - direct

1          The plaintiff did not establish his burden, and there

2     are just too many holes for any inference to be made that the

3     plaintiff proved its prima facie case.

4          Thank you.

5          THE COURT:  Thank you, Mr. Chun.

6          MR. ARONAUER:  Your Honor, if I may just give --

7          THE COURT:  Can you use the podium.  I am supposed to

8     require you to do that.

9          MR. ARONAUER:  Your Honor, if I may just give a very,

10    very brief rebuttal.

11         As I am sure the Court is aware, the Court I believe

12    is required to give a negative inference toward the employer if

13    the employer fails to keep records.  And this case is a

14    textbook example why that law exists.  So that way an employer

15    can't have an employee work off the books for X amount of weeks

16    or months, then not pay the employee correctly.  The employee

17    who is paid off the books then sues, and then the employer can

18    just throw up her hands and say, well, hey, there is no

19    evidence, there is no documentary evidence that you worked for

20    me -- or you didn't work for me for the time period you are

21    alleging -- and therefore I'm off the hook.  And that's why

22    that law exists.  This case is a perfect example of it.  Thank

23    you.

24         THE COURT:  Thank you.

25         OK.  Let's discuss now just scheduling.  Do the

K997PERT                          Caba – direct

1    parties wish to make written post-trial submissions for the

2    Court to consider before ruling?

3              MR. CHUN:  No.

4              MR. ARONAUER:  No, your Honor.

5              THE COURT:  All right.  So the Court will consider the

6    record closed and will issue a decision, including findings of

7    fact and conclusions of law in due course.  Thank you very much

8    for your submission.

9              Thank you to the parties and to the interpreters and

10   our court reporter.  And we are adjourned if there is nothing

11   further today.

12             MR. ARONAUER:  Thank you, your Honor.

13             MR. CHUN:  Thank you.

14             (Adjourned; decision reserved)

15

16

17

18

19

20

21

22

23

24

25